## Robinson v. Bailey.

April 28, 1939.

A. T. W. MANNING and EDWARD R. HAYS for appellant.
WILLIAM LEWIS for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

The appeal before us involves two questions, one whether or not appellant in operating his coal mine in Laurel County has encroached upon the leasehold of appellee. The other as to whether or not appellee has forfeited his lease by failing to work his mine properly, and in making proper accountings of the coal mined, and payments of royalties to appellant.

Prior to January 31, 1935, Bailey had become the owner of about sixteen acres of what was known as the H. L. Pearl tract, and later began operation. Prior thereto Bailey leased to Chester Robinson, and he began the mining of coal, his entry being near Bailey's entry.

After the operation had continued for about a year, Jack Pearl, a non-resident, appeared on the scene claiming to own the mineral rights, and instituted suit against both operators, seeking to evict them and asking damages for coal theretofore removed. He convinced the parties of his ownership and the suit was settled, the two operators agreeing to pay Pearl $375, in a manner later appearing.

On January 31, 1935, appellee and General Robinson, a son of appellant, entered into separate contracts with Pearl, the leases being in the usual form. Each provided that the royalties should be 25 cents per ton, until each lessee should pay one-half the $375, royalties on previously mined coal, thereafter the royalties to be 15 cents per ton. The boundaries set out in the two leases are as follows:

Bailey lease:

"Beginning with the drift mouth which Earl Bailey second party, has recently made upon what is known as the H. L. Pearl tract of land, and extending upon and along the 'H. L. Pearl tract of land as follows: thence in a western direction with entry to stay near enough to Clayburn Wyrick's line so that

150 feet rooms will work out to Wyrick's line, that is, 150 feet rooms on the left side of said entry will work out to Wyrick's line, and extending with Wyrick's line thus until said entry reaches J. L. Ormsby's land; thence with Ormsby's line, the same as with Wyrick's line, until said entry reaches the line of Dr. J. W. Parker; thence with Parker's line, the same as with Ormsby's line, staying 150 feet from his line in order to have 150 feet rooms reaching to said line until said contract expires, or until all of the coal worked in that direction with this particular entry is mined or operated. It being understood that party of the second part is entitled to operate rooms on the right of the entry a distance of 150 feet from said entry."

Robinson lease:

"Beginning with the drift mouth which General Robinson, second party, has recently made upon what is known as the H. L. Pearl tract of land, and extending in a northern direction near enough to the croppings of the coal, so that rooms turning off from the right of said entry will extend to the croppings of said coal and get all of the coal that can be mined from under the ground, the entire length of said H. L. Pearl's tract of land to Dr. J. W. Parker's line; it being understood that the party of the second part may operate rooms from the left of said entry a distance of 150 feet."

It appears from the record that contemporaneously with the execution of the leases between Pearl on the one hand and General Robinson, and appellee on the other, Chester Robinson, father of General Robinson, purchased from Pearl the coal rights underlying the tracts of land, and at the same time became the owner by assignment of the aforementioned leases. The leases are dated January 31, 1935. The deed to appellant was dated February 1, 1935, but there is proof to the effect that the transactions were had on the prior day. This is immaterial, since it is apparent from the record that the leases were executed and delivered contemporaneously.

Much is said in the briefs to the effect that Bailey and another had agreed with Chester Robinson that they would go in together and purchase the coal rights from Pearl, and that appellant telling the other parties

that Pearl "didn't like the Baileys," and would not deal with them, had secretly purchased the rights. This cuts no real figure, since it is not disputed that Chester Robinson at the time of the institution of the suit owned the rights, and was the assignee of the leaseholds, though it is clear that Bailey did not know of the Chester Robinson transactions until months thereafter.

After the execution of the leases both Bailey and General Robinson continued operations in the manner in which they had begun when Bailey thought he owned the coal rights. They had theretofore opened separate drift mouths, and had driven their entries and opened rooms to a considerable extent, when appellee became convinced that Robinson was encroaching upon his boundary. A discussion of the matter brought no re-results, so on June 28, 1935, Bailey filed his suit making both the Robinsons parties defendant.

Appellee in his petition plead in substance as above recited. More particularly as to the trespass, he charged that under his lease he was permitted to go westwardly with his main entry until he reached the Parker line, and following the Parker line remove coal for a distance of 150 feet on the right and left of his main entry. That the operators of the Robinson mine instead of mining in the direction provided in their lease had carried their entry to the west, and so near the Parker line as to cut him off from further operation toward the north, following the Parker line.

Appellee also asked for damages in the sum of $500, estimated profits on coal mined by defendants from his alleged boundary. On this phase of the case the court found that there was lack of sufficient proof to show how much coal was mined by the defendants from the Bailey lease before and after the execution of the leases, and this part of plaintiff's petition was dismissed without prejudice and without objection.

In response to appellee's petition, Chester Robinson filed separate answer and counterclaim. After substantially traversing all material affirmative allegations, in a second paragraph he plead his ownership of coal covered in appellee's lease as well as that in General Robinson's and the transfer and assignment of the two leases to him by Pearl, contemporaneously with the delivery of the deed. He then plead in terms the provisions and conditions of the Pearl-Bailey lease, which

had been assigned to him, which, as we have indicated, were in customary form, containing the usual forfeiture clause.

Appellant, in seeking concellation of Bailey's lease, specifically charged violations of the contract by Bailey in several instances, among which was the attempt by Bailey to transfer his lease without the written consent of Pearl, or his assignee. The proof failed in this respect, though it was shown that one Cloyd had opened a new entry toward the right off the main entry of Bailey, under some sort of working agreement. The proof shows that this operation by Cloyd, both before and since the institution of the suit, was with the full knowledge of both the Robinsons, and with the approval and consent of one or the other. It is shown that since the institution of the suit (and subsequent restraining order) the Robinsons had been observing Cloyd's removal of coal from the Bailey mine, and accepting royalties from him.

Another ground for cancellation was the alleged failure of Bailey to keep accurate accounts of coal mined by him or to pay royalties in the manner and at times stipulated in the contract. The proof on this is uncertain. The truth is, as it appears when we read the record, neither party undertook to keep accurate accounts, the appellant admitting the only way he could show same were by the receipts that had at times been given to appellee upon payment. Appellee admits that he kept no book of record. He paid his royalties based on the weights of the trucks of coal hauled from the mouth of the mine, or tipple, to which method appellant made no objection until his answer was filed in July, 1935. The receipts given by lessor show payments of royalties in full for each lease week, including June 2, 1935.

After Bailey filed suit, and about the time appellant answered and counterclaimed, Bailey began depositing the royalty dues in the bank at intervals, not subject to check, and continued to do this until a restraining order was issued, under which he stopped operations. So, there was little in the claim that Bailey had violated the terms of the lease in these respects.

Perhaps what was thought to be the most serious charge was to the effect that Bailey had agreed with his lessor to operate the mine in a workmanlike manner,

and in accordance with the mining laws of the Commonwealth, and that a mine inspector after examination had directed Bailey to cease operations. It was charged that Bailey had failed to ventilate the entry or rooms properly; to remove slate and slack; to drive his entries or rooms in such a way as would permit the removal of all mineable coal.

The proof on these alleged failures is not satisfactory. It seems that Bailey operated his mine in a way satisfactorily to lessor until appellant was about to file his answer and counterclaim. On or about July 3, 1935, the mine was visited by an inspector, who reported that he had recommended the cessation of operations until slack be loaded out of the mine; that "the mine be ventilated according to law," and mine map be made available. He also found absence of first aid material; lack of proper timber or props, and a regular monthly report to the Mining Department. The latter does not appear to have been charged as a violation of the lease, and some other failures found by the inspector were not specifically charged.

The inspector said he did not recall that there was any ventilating fan in operation at the time. The proof tends to show that prior to the suit there had been constructed an air-shaft between the entries in each mine. It is claimed, and does not seem to be disputed, that later this airway was bratticed from the Robinson side. Appellee says that later he cleaned out the airway, and did everything else that was suggested to comply with the inspector's recommendations.

The inspector did not return to the mine until a year later, and in the meantime a fan had been installed in the airway. Mine props had been installed and there seems to have been no further complaint. The inspector was under the impression that Cloyd had subleased from Bailey, and had complied with his recommendations, save displaying the mine map. Cloyd says, as does Bailey, that he was working his entry when the inspector made the latter visit, and he at once undertook to comply with his directions. It is certain that there was no objection on the part of appellant as to the manner in which Cloyd continued to operate and pay royalties to appellant.

The chancellor in passing on this phase of the case said:

"The court is clearly of the opinion that the defendants have not made out a case entitling them to a cancellation of the lease, and for that reason the defendants' * * * counterclaim is dismissed."

We have thus far discussed no questions relating to what we consider the main one in issue; whether or not appellee was entitled to an injunction prohibiting appellant from further encroaching upon his leasehold. Considerable proof was taken on this issue. Several lay witnesses, and two engineers, who had made rather indefinite surveys, testified. After all the proof was in and the cause submitted, the chancellor, in addition to the rulings above indicated, said:

"The court finds as a matter of fact, the defendant General Robinson, at the time complained of in the petition, was entering upon plaintiff's leased premises and daily mining and removing coal therefrom, and in violation of plaintiff's rights, and plaintiff was thereby damaged in his property rights."

The court then adjudged that the restraining order granted defendants upon the filing of answer and counterclaim was wrongfully obtained, and it was dissolved. The court further held that plaintiff had rightfully obtained the restraining order against the defendants, and was entitled to the injunctive relief sought, and from this and other unsatisfactory holdings of the court, Chester Robinson has prosecuted this appeal.

In reaching his conclusion as to encroachment, the court found as a matter of fact that each party obtained their respective leases at the time and in the manner indicated supra. That each was by his contract authorized to mine and remove coal "from under specific boundaries of land described. The plaintiff * * * was given a lease authorizing him to mine and remove the coal from a 300 foot strip, or boundary, lying alongside of the Wyrick land, M. M. Ormsby and Parker lands, and the lease provided that the main entry should be kept 150 feet away from the boundary lines of said lands, so that plaintiff could have rooms to the left of his main entry extending 150 feet and rooms to the right of his main entry extending 150 feet, covering a 300 foot strip of land."

The construction placed on Bailey's lease, as far as the proof shows, makes it apparent, upon consideration of defendant's lease, that there was an encroachment by

appellant on Bailey's 300 foot strip. The court did not undertake to give close construction to appellant's lease, but said: "On the same day General Robinson took a lease upon the strip of land lying to the right of plaintiff's land."

Counsel for appellant contends the judgment should be reversed because the proof was sufficient to have justified the court in adjudging on appellant's counterclaim that Bailey had by his failure to live up to the terms of his lease forfeited it. The court, on somewhat contradictory proof, held otherwise. As we review the proof we agree that the court was correct in his holding. If we had any doubt on this point, under our rules it would be resolved in favor of the chancellor's judgment. Wade v. Wade, 234 Ky. 447, 28 S. W. (2d) 504; Greenway v. Irvine's Ex'r, 234 Ky. 597, 28 S. W. (2d) 760; Cain v. Campbell's Adm'x, 265 Ky. 843, 98 S. W. (2d) 17; Lawson v. McNeil, 267 Ky. 297, 102 S. W. (2d) 42; Maggard v. Asher, 268 Ky. 416, 105 S. W. (2d) 184.

When we come to the construction of the two leases, we have no difficulty in reaching the same conclusion as the court that the boundary of the Bailey lease called for and included a definite strip of land 300 feet in width, to begin at the drift mouth recently opened by him, then to run with the Wyrick and Ormsby lines until he reached the Parker line. When he reached this line he was to turn at right angles and run with, and the entire distance of the Parker line on the west.

In his first call, following the Ormsby line, he was to stay near enough to Wyrick's line so that 150 foot rooms would work out to the lines. In other words, his entry was to be so located and run as to permit him to work 150 foot rooms to the left of his entry. Nothing is said here as to how far on the right of his entry he could work his rooms. When this call reached the Parker line, he was to continue his entry following that line, so as to work 150 foot rooms again to the left to the Parker line. However, in the last clause in the lease it is provided: "It being understood that party of the second part is entitled to operate rooms on the right of said entry a distance of 150 feet from said entry."

We need not here decide whether or not the proviso applies to the running of the entry or the length of the rooms on the right following the Ormsby line. The question involved relates in the main to the entry

and length of the rooms after Bailey reaches the Parker line, and there can be little doubt that it was the purpose and intent of the parties that Bailey was to have 300 feet of space for operation along the Parker line "until his contract expires, or until all the coal is worked out in that direction with this particular entry, is mined or operated." There is no expiration date fixed in the lease.

We have more difficulty when we come to read the Robinson lease. The claim is that the leases are ambiguous, and that there is necessarily an overlapping. This is due to the fact that the Robinson lease appears to carry one call of the boundary back to the Parker line, and the granting of the right to Robinson to mine out rooms 150 feet to the left of his main entry. The description of the boundary in the Robinson lease is much less definite than the description in the Bailey lease.

Robinson's boundary, as will be noted, is to begin at the drift mouth recently opened by Chester Robinson. It is then to extend in a northern direction near enough to the coal cropping so that rooms on the right of said entry will extend to the croppings. There is no limit to the length of the rooms operated toward the croppings on the right to a branch, which, under the proof, marked the outcropping. From the proof and maps we are unable to determine the area of the strip leased to Robinson, but the best we can gather is that it was somewhat larger than the strip leased to Bailey.

The lease then continues with relation to the right-hand room operation:

"And get all the coal that can be mined from under the ground the entire length of the Pearl land, to Dr. J. W. Parker's line; it being understood that the party of the second part may operate rooms from the left of said entry, a distance of 150 feet."

Had the draftsman of the leases used the words "parallel with Dr. Parker's line," instead "to" that line, there would be no difficulty, and while we are not at liberty to reform the lease by the insertion of the words, we may look to the two instruments, and likewise to the proof introduced to ascertain what was the understanding of both parties as to the boundary each was to be allowed to mine.

If Robinson's lease is to be carried in a "northern"

direction, until it reaches the Parker line, then there would necessarily be a slight overlapping of his operation with that of Bailey's as he approached the Parker line, if having rooms 150 feet in length on that side of his entry. As the proof and maps introduced clearly show, there is already an overlapping. In other words, if Robinson's lease carries him to the Parker line and Bailey has a 300 foot strip for operation following the Parker line, the entries are bound to intersect at some point before they reach the northern end of the Parker line. As we view the maps and read the proof, if Bailey's contention is correct, the Robinson entry, and many of the rooms to the left, are now on Bailey's boundary. This has come about by the evident fact that Robinson, in working out his entry, has not pushed it in a northern direction, but in a very decidedly northwesterly direction.

It appears from the drawings that though starting in a northwesterly direction, after reaching room No. 6, where he should have borne to the right, there was a movement to the left, up to about room No. 10, where there was a slight veering to the right, which continued to room No. 14, and then there was a movement to the left; then again from room No. 16 to the right. In the direction the entry now seems to be progressing, it could not reach the Parker line.

We are justified in saying that the Robinson entry has been worked in the wrong direction, by consideration of the leases and the proof. In the first place the Robinson lease provided for the entry to run in a "northern" direction. It is at points forced in a decidedly northwesterly direction. We also gather that it was the intention of lessee to have Robinson run his entry in the northern direction, with no limit to the length of rooms on the right, which would permit the mining of all coal to the outcropping. He was to operate to the left only 150 feet. Had he turned his entry slightly at room No. 7 or 8, and operated in a northern direction, he would have had 150 foot rooms reaching back to Bailey's north and south line, running with Parker's line, thus both he and Bailey mining out all the coal under the entire leased boundary, which seems to have been the intention of all parties concerned.

Appellant was careful to get into the record a copy of the lease from Bailey to himself, made at a time

when it was thought by both that Bailey owned the coal rights. This lease was executed in May 1934. When we turn to that lease we find that Bailey leased to Robinson a rather indefinite boundary. It was to begin "at the drift mouth of which party of the second part (Robinson) is now working at on party of the first parts place, and running in a northeastern direction to the line between party of the first part and party of the second part's land. Entry and room width entry is to be drove as near crop line as can be to get all the coal with the rooms on the right side of entry. * * * Party of the first part (Bailey) is to have the right to turn a left hand entry off of second party's entry for the purpose of working any or all of his coal that is not in this lease without any charges."

It will be noted that entry in this lease was to run in a northeastern direction, which would have taken it away from, rather than toward Parker's line. There was no provision for working any rooms to the left of the entry.

This lease becomes further significant in determining what was in the minds of all the parties when the leases were executed, and when we turn to appellant's proof we find him saying, in connection with matters leading up to, and the execution of the lease:

"Charlie Luker drawed them up, and they drawed General's lease just as near like the one Earl had given me; the same boundary, and then made Earl a lease too. It was the opinion of all of us that the leases wouldn't lap; that there would be room for a narrow entry in between, but the survey shows there weren't the 600 feet strip, and the crop line, that is all the way."

This evidence shows rather clearly that it was intended that Bailey was to have a 300 foot strip, running with Parker's line, and this would have been the situation had appellant pushed his entry in a northern direction.

When asked: "Who do you mean when you say 'we all supposed there would be room between these two mines of more than 300 feet'?" he replied, "There was me, Earl, General Robinson and Jack Pearl, and several different ones that was working there."

It also appears in the evidence that Bailey did not

know for some time what was contained in the Robinson lease, but Robinson had full knowledge of the Bailey lease, since he accepted assignment of it on the same or succeeding day of its execution.

When we analyze the proof we cannot escape the conclusion that all parties to the leases clearly understood that Bailey was to have a strip of coal running north and south with the Parker land, to be 300 feet wide; that Robinson was to have so much coal on the right of Bailey's lease as would carry him to the outcroppings of coal on the right, with 150 foot rooms to the left. It is obvious that the overlapping here is not due to the wording of the description in the Robinson lease, but due to the direction he continued to work the entry after he had obtained his lease. If the chancellor's construction of the leases was correct, and we think it was, then there was more than ample proof to justify the court in holding that appellant had encroached upon appellee's leasehold. All the witnesses, including the two surveyors, make this clear. In fact it is not seriously argued in brief for appellant that there was not a trespass, but an overlapping in the leases.

The fact is that appellant spends little time and space in the way of enlightenment to the court on this subject, devoting most of his brief to urging a reversal because of the court's ruling on appellant's counterclaim, a matter disposed of supra.

With the foregoing expression of our views, we are of the opinion that the court correctly ruled in granting the injunctive relief sought, and therefore must affirm the judgment in all respects.

Judgment affirmed.